Jones, Chief Judge,
dissenting:
I think that the Standard Oil Company was liable for the tax. The law imposes a tax on “gasoline sold by the producer.” I would find that Fleet-Wing acted merely as selling agent of the producer and not in its own independent capacity.
Some of the facts are not made clear in the findings and I think the findings should be modified so as to state them in more definite form. From the evidence and the record as a whole it is clear that Fleet-Wing was merely a controlled appendage of Standard Oil. Most of Fleet-Wing’s orders were filled by Standard products. Its pricing policies were determined by a market in which Standard Oil’s retail brands were the price leaders. Its officers and directors, with the exception of two, served in such capacities with Standard Oil. In my judgment the record does not fully sustain a finding that Fleet-Wing “determined its own business policies,” though as a practical matter it was undoubtedly permitted to determine minor details.
Fleet-Wing’s operations consisted of paper manipulations mainly. Normally its orders for gasoline were forwarded to Standard for delivery to Fleet-Wing’s customers; Standard handled the deliveries and Fleet-Wing kept no inventories. It does not appear that Fleet-Wing in any way altered the gas it bought; it simply sold gas, specially colored for it by the plaintiff.
The transaction in question was very unusual. Previously there had been very few large-quantity transactions between Fleet-Wing and Standard. The findings do not cite any other transaction where Fleet-Wing itself took delivery. Such delivery as was made in this instance was in Standard’s own tanks which were leased to Fleet-Wing for six months *650 and delivery of Fleet-Wing’s own gasoline was then bandied by Standard as usual. Standard turned out to be a very lenient landlord. As soon as a tank was emptied by Fleet-Wing, Standard cancelled the lease. Ordinarily it would be immaterial whether the parent or its wholly owned selling subsidiary paid the excise — it ultimately all shows up on Standard’s profit account. But when it became profitable to make Fleet-Wing appear independent, special legal trappings were donned for the occasion.
Had Fleet-Wing not been a wholly owned and controlled subsidiary, the transaction might well have been different. By stocking up on inventory an independent entity takes on additional risks or costs. It must temper its inventory policies accordingly. Here the subsidiary took only risks and costs that would have been incurred by the parent company in any event. Whether these costs would find their way into Standard’s income statement directly or indirectly was in itself immaterial. The parent, therefore, had no good business reason for not instructing its subsidiary to take title to the gasoline.
I fully concede the right of a taxpayer to choose the method of doing business that will make his taxes less than another method. Sometimes the line of distinction is very thin between a real and a make-believe change of policy. But to permit a temporary change of this character made for the sole purpose of avoiding a tax would encourage large concerns to maintain subsidiaries purely for such purposes.
Fleet-Wing increased its price the amount of the additional tax which became effective July 1, 1940, and thus passed it on to its customers or to the ultimate purchasers. In doing so it was acting as the selling agent of Standard. Plaintiff is therefore not entitled to recover because it has not met the requirements of section 3448 (d) of the Internal Revenue Code of 1939.
I would dismiss plaintiff’s petition.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
*651 1. Plaintiff, The Standard Oil Company, is an Ohio corporation engaged in the business of manufacturing and selling petroleum products, including gasoline, and was so engaged in the year 1940.
2. Fleet-Wing Corporation, hereinafter called Fleet-Wing, is an Ohio corporation engaged in the sale of petroleum products, including gasoline.
3. In the calendar year 1940 the entire capital stock of Fleet-Wing was owned by the plaintiff.
4. On June 28, 1940, the plaintiff entered into an agreement with Fleet-Wing providing for the sale of 6,300,000 gallons of Fleet-Wing Golden Gasoline by the plaintiff to Fleet-Wing. Said agreement was signed on behalf of the plaintiff by S. A. Swensrud, Vice President of the plaintiff and on behalf of Fleet-Wing by W. J. Loufman, Vice President.
5. By lease agreement dated June 21, 1940, the plaintiff, acting by and through W. J. Semple, its Vice President, leased to Fleet-Wing certain gasoline storage tankage, to wit:
Tank No. 3 located at Canton, Ohio, Tank No. 161 located at Cleveland, Ohio, Tank No. 162 located at Cleveland, Ohio, Tank No. 121, located at Toledo, Ohio, Tank No. 46, located at Toledo, Ohio, Tank No. 72 located at Lima, Ohio, Tank No. 1 located at Lima, Ohio, and Tank No. 3 located at Cincinnati, Ohio,
which tanks were described in said lease agreement, and had the approximate capacities for the storage of gasoline indicated in the agreement.
6. On June 29, 1940, the plaintiff, by its Vice President S. A. Swensrud, sold to Fleet-Wing by bill of sale 6,300,000 gallons of gasoline, described and identified as Fleet-Wing Golden Gasoline.
7. The following tabulation gives the details contained in the invoices rendered by the plaintiff to Fleet-Wing and relating to the sale of the 6,300,000 gallons. The cities named in this and the following tabulation are all in Ohio.

*652

The following tabulation gives the details as to the purchase orders given by Fleet-Wing to the plaintiff prior to the delivery of the gasoline into the leased tanks. Each order was approved by one E. W. Miller. His position in the Fleet-Wing organization is not shown by the record.

8. On June 29, 1940, the plaintiff by S. A. Swensrud, Vice President, informed Fleet-Wing through W. J. Louf-man, Vice President, that the gasoline referred to in the agreement dated June 28th, had been placed in the gasoline storage tanks at the various locations as requested by Fleet-Wing.
9. The transaction covering the sale of approximately 6,300,000 gallons of Fleet-Wing Golden Gasoline by the plaintiff to Fleet-Wing was initiated by Fleet-Wing at the direction of W. J. Loufman. Following the request for sale of the gasoline, the plaintiff leased to Fleet-Wing Corporation the tanks and equipment specified in plaintiff’s exhibit 6, and pursuant to orders placed by Fleet-Wing the supply and distribution department of the plaintiff then executed said orders by issuing instructions to the plaintiff’s several refineries to make deliveries of Fleet-Wing Golden Gasoline to *653 the tanks leased to Fleet-Wing. The tanks were ganged and the quantity of gasoline delivered into each tank ascertained, after which the tanks were locked and the keys turned over by the plaintiff to Fleet-Wing. The deliveries at the respective geographical points occurred between June 27 and June 30, 1940, and all deliveries were made prior to midnight June 30,1940.
10. After July 1,1940, Fleet-Wing made sales of the gasoline, which it had purchased, to its customers and issued shipping orders to the supply and distribution department of the plaintiff. This department of the plaintiff in turn relayed the information to terminal operators at the various tank locations, who in turn filled the Fleet-Wing sales to its customers from the Fleet-Wing storage tanks.
11. None of the gasoline sold by the plaintiff to Fleet-Wing was used to fill orders of the plaintiff and none of the gasoline was sold to persons other than Fleet-Wing customers.
12. The tanks containing Fleet-Wing Golden Gasoline were emptied at different times following July 1, 1940, and returned when empty to the plaintiff. All of the gasoline in question had been delivered to Fleet-Wing customers by the end of October 1940. None of the gasoline was delivered to Fleet-Wing customers prior to July 1,1940.
13. During the same period, July 1, through October 1940, the plaintiff also made deliveries to Fleet-Wing customers from storage facilities other than those that were leased by the plaintiff to Fleet-Wing in June 1940. The storage tanks leased by the plaintiff to Fleet-Wing in June 1940 represented approximately five percent of the plaintiff’s total storage capacity.
14. During June 1940 Fleet-Wing sold approximately 8 million gallons of gasoline, and during the month of July 1940 Fleet-Wing sold 6,080,000 gallons of gasoline. The approximately 6,300,000 gallons of gasoline transferred by the plaintiff to Fleet-Wing in the latter part of June 1940 represented approximately three weeks’ supply of Fleet-Wing’s requirements for gasoline.
15. The transfer of the approximately 6,300,000 gallons of gasoline represented not more than 10 percent of the total gasoline inventory of the plaintiff and the plaintiff possessed, *654 after making delivery of this amount of Fleet-Wing Golden Gasoline, sufficient gasoline to supply the requirements of its own customers.
16. From time to time, prior to 1940, Fleet-Wing had purchased gasoline from suppliers other than the plaintiff and in June of 1940 it obtained about 15 percent of its requirements from sources other than the plaintiff.
17. The plaintiff did not compete with Fleet-Wing in the sale of the brand of gasoline known as Fleet-Wing Golden Gasoline. This gasoline was manufactured by the plaintiff upon order by Fleet-Wing and to specifications of Fleet-Wing for this gasoline. The plaintiff sold regular gasoline under the trade-name “X-70”, and premium gasoline under the trade-name “Sohio Premium”. Fleet-Wing did not market a premium grade of gasoline. There was no substantial difference between the octane rating of Fleet-Wing Golden Gasoline and Sohio “X-70” gasoline in the year 1940. The chief difference in the two grades of gasoline was the golden color used for identification purposes by Fleet-Wing. The specifications on Fleet-Wing gasoline remained the same throughout the years 1940 to 1948.
18. In 1940 the officers and directors of the plaintiff were W. T. Holliday, President and Director; A. M. Maxwell, Vice President and Director; W. J. Semple, Vice President and Secretary-Treasurer; A. A. Stambaugh, Vice President and Director; S. A. Swensrud, Vice President and Director; G. W. Hanneken, Vice President and Director; E. W. Allgower, Assistant Treasurer and Assistant Secretary; G. J. Hylkema, Assistant Secretary; H. L. Patch, Controller; W. G. Daniels, Assistant Controller; J. O. Tice, Assistant Controller, and W. A. McAfee, Director.
19. The officers and directors of Fleet-Wing in June 1940 were W. T. Holliday, President and Director; W. J. Louf-man, Vice President; W. J. Semple, Vice President, Treasurer and Secretary; 8. A. Swensrud, Vice President; E. W. Allgower, Assistant Treasurer and Assistant Secretary; C. D. Brown, Assistant Treasurer and Assistant Secretary; A. M. Maxwell, Director; G. W. Hanneken, Director; W. A. McAfee, Director; A. A. Stambaugh, Director; and H. L. Patch, Controller.
*655 20. In June 1940 the offices of the plaintiff were located on the 16th and 17th floors of the Midland Building, Cleveland, Ohio, and on May 2, 1940, the Articles of Incorporation of Fleet-Wing were amended to show that Fleet-Wing’s principal offices were thereafter to be on the 16th floor of the Midland Building, Cleveland, Ohio.
21. The following is a summary of the history and development of Fleet-Wing. W. J. Loufman, who, at the time the events here involved which occurred in 1940, was the Vice President and the actual managing head of Fleet-Wing, was in 1920 the Vice President and a stockholder of Bepublic Oil Company, which sold petroleum products to jobbers in the Pittsburgh, Pennsylvania, area. One B. B. Spears was the President and principal owner of Spears and Biddle Company, which had a similar business in the Wheeling, West Virginia, area. Spears and Biddle had a franchise with a company which controlled the process of mixing tetra-ethyl lead with gasoline, and mixed that ingredient with the gasoline which they sold to jobbers.
Loufman, for Bepublic, made a contract with Spears and Biddle which made Bepublic its sole marketing agent. Gasoline treated with tetra-ethyl lead came into common use. The U. S. Department of Health became concerned about the promiscuous use of this ingredient, and the owner of the process urged Spears and Biddle to acquire a manufacturing plant so that there might be closer control of the mixing. Spears and Biddle negotiated with the plaintiff, which agreed to buy a controlling interest in Spears and Biddle. The Fleet-Wing Oil Corporation was formed to carry on the distribution business which had, up to that time, been done by Bepublic. Its name was, at some time not later than June 1940, changed to Fleet-Wing Corporation.
Spears and Biddle and, in its turn, Fleet-Wing, sold gasoline and other petroleum products to jobbers. Jobbers received the gasoline in tank car quantities and stored it in tanks. They then sold the gasoline to dealers who operated service stations or to other large consumers, and delivered the gasoline to them by tank trucks. Fleet-Wing and, before it, Spears and Biddle, did not operate service stations or sell or deliver gasoline to operators of service stations. Spears and *656 Kiddle, and, in its turn, Fleet-Wing, sold their products under the trade-mark “Fleet-Wing”.
At the time the plaintiff bought the controlling interest in Spears and Kiddle, that company was selling some 700 cars per month of gasoline mixed with tetra-ethyl lead. Now this gasoline was to be manufactured by the plaintiff, and Fleet-Wing requested and obtained from the plaintiff a guaranty that the product sold to Fleet-Wing, and by it to its jobbers, would be of as good quality as that sold by the plaintiff directly to dealers or customers, under the plaintiff’s own name. Mr. Loufman, who had no connection with the plaintiff, went to work for Fleet-Wing, became Sales Manager in about 1936 and, by 1940, was Vice President. He was a dominant factor in determining the marketing policies of Fleet-Wing.
Fleet-Wing solicited contracts with jobbers under which it would supply their requirements of petroleum products which they would sell under the Fleet-Wing trade-mark. It held the same jobber customers for many years. It colored its gasoline and called it Fleet-Wing Golden Gasoline. Its gasoline was sold in the same areas and in competition with that sold under the plaintiff’s own trade-marks. Its advertising was conducted by a different agency than the one the plaintiff employed. It spent some $275,000 a year for advertising. Its sales of gasoline increased from some 33 million gallons in 1933 to 82 million gallons in 1940. In 1940 it had 115 jobber customers and a payroll of $65,000.
From 1933 to 1936, Fleet-Wing was by contract made an agent of the plaintiff. This was to bring it under closer control of the plaintiff as to its credit policies and its attempted extension into the field of nonpetroleum products, and to eliminate a tax disadvantage to which it and its customers were subjected under the tax laws then in force. In 1936, the reasons for the agency arrangement having ceased, the agency contract was terminated and an agreement designating Fleet-Wing as an “independent contractor” was made.
Fleet-Wing had no storage facilities of its own for gasoline. When it received an order from a jobber, it requested the plaintiff’s most conveniently located establishment to ship gasoline, colored in accordance with the Fleet-Wing trade *657 mark, to fill the order. If the plaintiff had a shortage of gasoline, or if Fleet-Wing’s jobber customer was not in an area where the plaintiff had gasoline on hand, Fleet-Wing had its orders filled by shipments from manufacturers other than the plaintiff. During 1940 the plaintiff obtained about one-third of its gasoline from such other manufacturers, they being Standard Oil Company of New Jersey, Shell Refining Company, and Richfield Oil Company.
22. During the spring of 1940 it became common knowledge that an additional manufacturers’ tax was to be assessed against the oil industry, and that an additional assessment of federal excise tax on gasoline was to be levied by the government. Dealers sought to fill their inventories with gasoline prior to levy of the additional tax.
23. All Fleet-Wing’s competitors who supplied jobbers of the type which Fleet-Wing sold were acquiring a supply of gasoline ample to supply their customers so that they in turn could acquire supplies prior to levy of the additional tax. There was a custom established in the industry of filling dealers’ tanks and the larger customers’ tanks in advance of anticipated price rises. Such advance filling is done on the occasion of any price advance, and the dealers and larger accounts are supplied such fill-ups whenever a tax raise or price advance occurs. For example, Fleet-Wing’s gasoline sales in both May and June 1940 were more than 2,000,000 gallons in excess of sales in July 1940. These figures serve to indicate the desire of Fleet-Wing’s jobbers to build up their inventories prior to the effective date of the expected federal excise tax.
24. Fleet-Wing approached The Standard Oil Company (Ohio) and requested a quantity of gasoline. The sale of gasoline in tank cars seemed impractical for the reason that the gasoline would move only a comparatively short distance from the point of origin to the customer. The only practical method seemed to be to request the plaintiff to lease to Fleet-Wing tanks which would permit it to store as much gasoline as it could. Fleet-Wing was only able to persuade the plaintiff to give it a limited gallonage.
25. In June 1940 there was what was described as a buyer’s market in gasoline. The price at which the plaintiff sold the *658 gasoline to Fleet-Wing in June 1940 was 5.75$ per gallon and represents a weak market price.
26. Fleet-Wing paid to the plaintiff a rental of 0.003$ per gallon per month for the use of the leased storage tanks. This rental appears reasonable, for it was not uncommon for suppliers to furnish storage facilities for a short time in connection with the sale of a large volume of gasoline in a weak market free of charge to the buyer. The tank rental amounted to approximately $1,800 per month.
27. The purchase of a large quantity of gasoline from the plaintiff was not an unusual transaction. Following 1940 as the Fleet-Wing gasoline business increased there were several occasions on which gasoline was purchased in million-gallon quantities for resale to its jobbers. One such transaction occurred in 1932 but there were very few large quantity transactions prior to the one involved in this action.
28. In the administration of Fleet-Wing affairs, Mr. W. J. Loufman consulted occasionally with Mr. W. T. Holliday. It was generally understood among the management officials of the plaintiff that contacts between Fleet-Wing Corporation and the Standard Oil Company should be made between Mr. W. T. Holliday personally and Mr. Loufman. Mr. Loufman occasionally consulted with Mr. M. E. Newcomer, Fleet-Wing attorney. Mr. Loufman was never a director, officer or employee of the plaintiff; he was once told that Fleet-Wing was a stepchild of the plaintiff.
29. On one or two occasions, Fleet-Wing purchased gasoline from the Ashland Oil & Eefining Company in the Cincinnati area, either because the plaintiff did not have supplies available or because the Ashland price was low due to excess production.
30. The record does not establish that the plaintiff did, by price concessions, give any special consideration to Fleet-Wing during the course of the business transactions between the plaintiff and Fleet-Wing.
31. The prices at which Fleet-Wing was to obtain gasoline from the plaintiff, pursuant to the agreement of March 12, 1936, were tank car delivered prices, less ⅜ths-of-a-cent per gallon. The same price structure had been negotiated between Fleet-Wing and The Standard Oil Company of New *659 Jersey with respect to gasoline sold in Fleet-Wing territory east of Ohio, and this price arrangement was in effect after the direct purchase arrangement by Fleet-Wing from The Standard Oil Company of New Jersey had been replaced by an exchange agreement between The Standard Oil Company of New Jersey and the plaintiff. On gasoline sold by the plaintiff to Fleet-Wing in Ohio territory the price to Fleet-Wing was such as to show a one-half-cent margin to Fleet-Wing.
32. The plaintiff did not compete with Fleet-Wing in jobber business even in the year 1940. The plaintiff did not have posted prices for jobbers.
33. Fleet-Wing prices were arrived at by determining the competitive price in the general sales area. Fleet-Wing could not obtain more for its gasoline than the price which Shell Oil, Socony-Vacuum or Cities Service obtained from their jobber customers, and the jobber price formula of Fleet-Wing ordinarily reduced itself to a figure below a price at which the gasoline could be sold by jobbers. The gross margins of distributors or jobbers between 1929 and the date of the hearing varied from 4 cents below the dealer’s price to as little as 1% cents below the dealer’s price, and Fleet-Wing’s jobber’s price was established to meet the competition so that the prices which the plaintiff received from Fleet-Wing varied with the market conditions at any given time. Fleet-Wing’s judgment of the competitive price situation at retail, dealer and jobber levels was seldom questioned.
34. During the years from 1929 to the date of the hearing the competition in the gasoline business increased to such an extent that it became necessary for each supplier to utilize a trade-mark brand. Prior to 1929, gasoline could be sold without a brand name. However, the plaintiff’s management decided that it would not sell brand-name gasoline under the Sohio trade-mark to jobbers, and the function of Fleet-Wing throughout the years has been to purchase gasoline from the plaintiff and sell it under its own brand name of “Fleet-Wing.”
35. By means of solicitation of jobbers on a requirement basis Fleet-Wing was fairly well assured of making a profit, the requirement contract fixing a basis for its orders from *660 the plaintiff and its other suppliers. Whenever price concession wars made necessary a sudden drop in the retail price of gasoline, it was customary for Fleet-Wing to bear a part of the financial burden caused by the distressed market and for it to request its suppliers, including the plaintiff, to bear part of the financial burden entailed. On one occasion Fleet-Wing applied for price concessions from The Standard Oil Company of New Jersey when the retail price structure was “soft”.
36. Following July 1,1940, Fleet-Wing advanced its prices. In many instances the increase was % cent per gallon; in some instances % cent; in one situation the price was reduced one-half cent per gallon; but the increase in price varied with the competitive circumstances in the jobber’s area. Fleet-Wing attempted to get the best price possible for its gasoline, i. e., all the traffic would bear.
37. The prices charged by Fleet-Wing for the Fleet-Wing oil and gasoline purchased from the plaintiff prior to July 1, 1940, were not influenced by the plaintiff in any way.
38. It was known that the tax involved was a manufacturer’s tax and Fleet-Wing, as did its competitors, wanted the best margin between the price which it paid for the gasoline and the price at which it could be sold. The price negotiated for the gasoline sold by the plaintiff to Fleet-Wing was the same as the price paid by Fleet-Wing earlier in the month of June 1940.
39. The plaintiff was, during the entire year 1940, engaged in the business of manufacturing, processing, producing and selling gasoline, at wholesale and retail, and was at all times during 1940 a manufacturer of gasoline within the meaning of section 3412 of the Internal Revenue Code.
40. During the entire year 1940, Fleet-Wing was a wholly owned subsidiary of plaintiff and was a “dealer” in, and not a “producer” or “manufacturer” of, gasoline.
41. In the year 1940 and for a period prior thereto from 1936 to 1940, Fleet-Wing maintained its own offices and had its own sales accounting offices and administrative staff, conducted its own advertising and determined its own business policies; it purchased gasoline from suppliers, most of it from plaintiff, and resold the gasoline so acquired to its own *661 customers in the ordinary course of business, and not by or through the use of any part of the sales organization of the plaintiff or the customers of the plaintiff.
42. During the month of June 1940 the federal excise tax imposed upon the sale of gasoline by a producer thereof was one cent per gallon. Effective July 1, 1940, the excise tax was increased to one and one-half cents per gallon.
43. The amount of gasoline sold by the plaintiff to Fleet-Wing in the transaction involved in this suit was 6,308,940 gallons. The price charged was the same as that which had been charged for some months prior thereto. The invoices in the former sales listed a one-cent “Federal tax” in the price charged.
As a separate item on the invoices covering the sale described in findings 6 and 7 there was listed a charge of one cent per gallon for “Federal tax” and Fleet-Wing paid to the plaintiff the purchase price of the gasoline and the additional charge of one cent per gallon.
44. In July 1942 the Commissioner of Internal Revenue levied an assessment against the plaintiff in the total amount, including interest through July 29,1942, of $35,016.28, claiming said additional tax to be due under the provisions of sections 3412 and 3413 of the Internal Revenue Code as a result of the transaction of June 29,1940.
45. On August 7, 1942, the plaintiff received from Frank Gentsch, Collector of Internal Revenue for the Eighteenth District of Ohio, a notice on demand for the payment of a deficiency assessment in the amount of $31,546.00 representing excise tax on gasoline and lubricating oils — $3,471 representing interest upon said deficiency assessment through July 29,1942. Thereafter, by check, the plaintiff paid on or about August 13,1942, in response to said notice and demand to the Collector of Internal Revenue, Eighteenth District of Ohio, the sum of $35,016.28.
46. The plaintiff at no time requested payment of said amount of $35,016.28 or any part thereof from Fleet-Wing and the plaintiff did not thereafter receive from Fleet-Wing Corporation any part of said sum of $35,016.28. As between the plaintiff and Fleet-Wing, the plaintiff bore the financial *662 burden of tbe additional assessment and interest in the amount of $35,016.28.
47. Thereafter, the plaintiff on June 24,1943, filed with the Collector of Internal Revenue for the Eighteenth District of Ohio at Cleveland, Ohio, its claim for refmid wherein it requested refund in full of the entire amount of tax and interest imposed in the assessment hereinbefore discussed.
On March 16,1946, the plaintiff filed with the Collector of Internal Revenue for the Eighteenth District of Ohio, an amended claim for refund wherein it requested refund, in full, of the entire amount of taxes and interest imposed in the assessment hereinbefore described. On May 15, 1947, Joseph D. Noonan, Jr., Commissioner of Internal Revenue, by D. S. Bliss, Deputy Commissioner, addressed to the plaintiff a letter of rejection of the plaintiff’s amended claim for refund. The Commissioner of Internal Revenue held that sales of gasoline made by Fleet-Wing subsequent to July 1, 1940, out of inventories of gasoline sold by the plaintiff just prior to July 1,1940, were all to be treated as sales made by the plaintiff. The Commissioner of Internal Revenue, in making said assessment, determined that Fleet-Wing was, during the period for which said assessment was made, acting as agent for the plaintiff.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover and it is adjudged and ordered that plaintiff recover of and from the United States the sum of thirty-five thousand fifteen dollars and ninety-two cents ($35,015.92) with interest according to law.